UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Richard Randall                                    Civil No. 07-3787 RHK/FLN

        Plaintiff,

   v.

Michael J. Astrue,                          **REPORT AND RECOMMENDATION**
Commissioner of Social Security

        Defendant.

_____

Kathleen M. Davis, Esq., for Plaintiff
Lonnie F. Bryan, Assistant United States Attorney, for the Government
_____

Plaintiff seeks judicial review of the final decision of the Commissioner of Social Security

("Commissioner"), who denied his application for Supplemental Security Income benefits ("SSI").

This matter has been referred to the undersigned United States Magistrate Judge pursuant to 28

U.S.C. § 636 and Local Rule 72.1(c).  This Court has jurisdiction over the claim pursuant to 42

U.S.C. § 405(g).  The parties have submitted Cross-Motions for Summary Judgment [#9 and #11].

For the reasons that follow, the Court recommends that the Commissioner's decision be affirmed.

## I. INTRODUCTION

Plaintiff, Richard Randall, applied for SSI with an alleged onset date of January 1, 1996.

(Tr.16, 73-74.)  Mr. Randall later amended the alleged onset date to July 19, 2004.  (Tr. 372.)  The

Social Security Administration denied the application on October 11, 2004.  (Tr.48-51.) The Social

Security Administration denied Mr. Randall's requested reconsideration on February 3, 2005.  (Tr.

53-55.) On March 29, 2005, Mr. Randall requested a hearing before an Administrative Law Judge

("ALJ").  (Tr. 40-41.)  After appearing with his representative, a legal assistant, at an August 23,

2006 hearing, the ALJ found that Mr. Randall had the residual functional capacity ("RFC") to

perform a range of sedentary work, and found him not disabled.  (Tr. 19, 25.)  Plaintiff appealed

that decision to the Appeals Counsel on December 12, 2006.  The Appeals Council denied review

of the ALJ decision on June 26, 2007.  (Tr. 5-7, 11.)

Mr. Randall initiated this action on August 24, 2007.  Mr. Randall moved for summary

judgment on January 25, 2008. [#9].  The Commissioner filed his Motion for Summary Judgment

on March 13, 2008. [#11].  Mr. Randall raises five issues in his motion: (1) whether substantial

evidence supports the ALJ's assessment of the chronic nature and severity of Mr. Randall's edema;

(2) whether substantial evidence supports the ALJ's determination of how long Mr. Randall needs

to elevate his lower extremities at midday; (3) whether the ALJ's credibility assessment of Mr.

Randall's testimony is supported by substantial evidence in the record; (4) whether the ALJ erred

in finding that Mr. Randall had past relevant work; and (5) whether the ALJ erred by choosing a

hypothetical that did not relate with precision to all of Mr. Randall's relevant impairments and their

effects.  Because the Court concludes the ALJ's decision is supported by substantial evidence on

the record as a whole, the Court affirms the decision of the ALJ and the Commissioner of Social

Security.

## II. STATEMENT OF FACTS

### a.      Background

Mr. Randall was born July 10, 1964, and was 43 years old at the time of the ALJ's decision.

(Tr. 89.)  He has past relevant work in computer operation and maintenance, and as a customer

service clerk.  (Tr.92-93, 368.)  Mr. Randall completed high school and received an Air Force

2

Certificate of training after two years of Air Force technical school. (Tr. 345.) Mr. Randall suffers from morbid obesity, bilateral knee pain, possible osteoarthritis, genu valgum (knock knee), some associated chronic peripheral edema, and heel pain associated with chronic tendinitis and a February, 2004 avulsion fracture. Mr. Randall has had numerous surgeries to his knees beginning in 1989 and had bilateral palletectomies in the early 1990s. Mr. Randall also has had two ligamentous left wrist surgeries, and treatment for his heel pain. There is also a history of chronic pain syndrome and evidence of past nonsevere adjustment disorder and depression. (Tr. 204-207, 362-363.)

### b. Medical Evidence- Physical Impairments

#### 1. Knee

Mr. Randall's pain dates back to the late 1980s when he started having dislocations of the patallae. (Tr. 204.) He had numerous arthroscopies and surgeries performed that led to a left patellectomy in November 1990 and a right patellectomy in March of 1991. (Tr. 204.)

In late February 2003, Mr. Randall was prescribed a hinged knee brace for his left knee and was considering arthroscopic surgery for his right knee. (Tr. 272.) In mid-April 2003, Mr. Randall sought pain management treatment at the Fairview-University Medical Center Pain Management Center. (Tr. 272.) Mr. Randall initially described having symptoms of knee pain and lower back pain secondary to the knee pain. He described his knee pain as feeling "like glass in my joints," and as ranging from 3-10/10 with an average of about 5/10. (Tr. 204.) He explained that the pain was severe enough to affect his sleeping patterns and to interfere completely with his work, outside chores, and any other activities beyond low level physical demand activities. (Tr. 204.) Dr. Charry, Mr. Randall's pain management doctor, recommended that Mr. Randall undergo physical

therapy as well as evaluation for the use of TENS unit. Dr. Charry also recommended that Mr. Randall continue taking the pain killer Percocet. (Tr. 208.) By May 2003, Mr. Randall reported his pain at 4/10, but sometimes reaching 10/10. (Tr.197.) By August 2003, Mr. Randall reported that his physical therapy was easing the pain in his lower back and hips, but that he continued to have knee pain. (Tr. 195.)

In January 2004, the onset of winter brought an increase of Mr. Randall's knee pain. Mr. Randall reported his pain as ranging between 6-7/10 during day, and 10/10 at night. Mr. Randall explained that he was taking one or two Percocets to "take the edge off at night, but would wake approximately four hours later from the pain." (Tr.194.) At that time, Mr. Randall was instructed to discontinue taking ibuprofen as it was not providing any significant benefit, and was recommended indomethacin instead. (Tr. 194.) In February 2004, Dr. Smith, Mr. Randall's primary doctor, described his knees as having "bone on bone arthritis." (Tr. 298.)

By late April 2004, Mr. Randall reported his pain at 8/10 and explained that he was unable to walk well because of his knee pain and a recent injury in the Achilles tendon. At this time it was recommended that Mr. Randall discontinue using indomethacin and begin taking Bextra. It was also recommended that Mr. Randall try acupuncture in addition to his medication. (Tr. 190.) By mid-September 2003, Mr. Randall reported that his knee pain, on occasion, was severe enough to bring him to tears and that his acupuncture was proving ineffective. (Tr. 190.) At that time, Mr. Randall was walking with a cane. (Tr. 190.) Mr. Randall was advised to take additional Percocet if needed, but not to exceed four tablets a day. At this point, Mr. Randall also agreed to seek a referral to a weight loss specialist. (Tr. 186-187.) Mr. Randall was also advised to become involved in a chronic pain management group-based program, but Mr. Randall did not because his

insurance would not cover such treatment.  (Tr. 187.)

In early December 2004, Mr. Randall's knee pain again worsened due to the seasonal change.  (Tr. 181.)  Mr. Randall was advised to replace his ibuprofen with Celebrex for about a month to endure the seasonal flare up.  Dr. Charry recommended a pain-flare management program, but Mr. Randall's insurance again could not cover such treatment.  (Tr. 181.)  At this point, Dr. Charry indicated that there was not much more treatment Mr. Randall could receive from the Pain Management Center, and that Mr. Randall ought to be discharged to continue follow-up with Dr. Smith, his primary doctor at the Quello Clinic.  (Tr. 181.)

In April, 2005, Dr. Kearns, at Orthopedic Medicine & Surgery, LTD., noted that Mr. Randall had pain in the knees, and extensor mechanisms that were unstable and liable to dislocate.  (Tr. 232.)  Dr. Kearns noted that Mr. Randall's symptoms appeared to be severe.  (Tr. 232.)  Mr. Randall was also noted to be using a cane.  (Tr. 232.)  A MRI of Mr. Randall's knee revealed mild joint effusion with mild generalized synvitis and findings consistent with patellectomy and reconstruction of the extensor mechanism.  (Tr. 225, 228-229.)  After reviewing the findings, Dr. Kearns felt there were no operations available that could make Mr. Randall feel better.  At that point, Dr. Kearns recommended additional physical therapy and/or additional pain management.  (Tr. 225.)

### 2. Edema

The record reflects a continued history of edema.  In April 2003, Dr. Charry noted that Mr. Randall had minimal lower extremity edema being more evident at the ankles.  (Tr. 207.)  In January 2004, Dr. Charry noted mild lower extremity edema.  (Tr. 193.)  In February, Mr. Randall was noted to have peripheral edema at one check up (Tr. 300), and in another, Dr. Smith noted non-

pitting edema in his right ankle and recommended that Mr. Randall elevate his feet as much as possible (Tr 298). In late April 2004, Dr. Charry observed mild lower extremity edema (Tr. 186), but by June 2004, Dr. Smith noted that Mr. Randall had continuing 3+ and, later, 2+ edema to the knees and both legs (Tr. 291-292). Dr. Smith identified the edema as chronic, and again noted Mr. Randall should elevate his feet as much as possible. (Tr. 292.) Mr. Randall was prescribed Lasix at this time. (Tr. 292.)

In October 2004, in describing his edema problems, Mr. Randall explained that anytime he sits, his ankles become swollen. (Tr. 289.) By February 2005, Dr. Smith noted that Mr. Randall's edema had gotten worse and that he had bilateral pitting edema of both lower extremities. (Tr. 285.) By April 2005, Dr. Smith noted massive edema in both legs. (Tr. 284.) At this time Mr. Randall also complained that his edema medication was dehydrating him to the point that he was experiencing eye pain from lack of tears. (Tr. 284.) By September 2005, Mr. Randall had "a tremendous amount of lower extremity edema" and he reported that when he was not recumbent, he had very little urine production, however that when he would lie down, he would have to use the bathroom frequently to relieve his edema. (Tr. 281.)

By early February 2006, Mr. Randall's edema was noted as 1+ bilateral ankle edema (Tr. 301), and by May 2006, Mr. Randall was noted to have bilateral edema of both lower extremities (Tr. 333). At that time Mr. Randall also reported continued discomfort when taking his edema medication as it dried out his eyes. (Tr. 333.)

### 3. Ankle and Heel

In late January 2004, Mr. Randall "stepped wrong" off a stool and injured his left heel. After examination, Dr. Richard Lochner's differential diagnosis was that Mr. Randall had a

posterior calcaneus spur fracture, an Achilles tendon strain, and a possible plantaris tendon rupture. (Tr. 249-250.)  Mr. Randall was prescribed a Low Profile walker with a heel lift and given crutches to support his leg.  (Tr. 250.)  By early March 2004, there were indications that Mr. Randall's heel was healing, and he was given a cast boot to be placed over his short leg cast so that he could put pressure on his foot with the aid of crutches.  (Tr. 245.)  In mid-April 2004, Mr. Randall had improved overall and was allowed to begin partial weight bearing on his heel.  He was given a Swede-O brace to protect his foot.  (Tr. 241.)  Later that month, however, Mr. Randall's heel pain returned with complaints of "stabbing pains in the left heel." (Tr. 240.)  In July 2004, Mr. Randall was prescribed a left heel silicone pad to cushion the area (Tr. 239), but the pad provided no relief, and Mr. Randall was again prescribed a low profile walker in August 2004 (Tr. 238).

In November 2004, Mr. Randall was assessed to have left chronic Achilles tendinitis and right acute insertional Achilles tendinitis.  (Tr. 236.)  Mr. Randall decided to proceed with surgery of his left heel consisting of debridement and Haglund's deformity resection.  At this time Mr. Randall was also prescribed a Low Profile walker for his right heel.  (Tr. 136.)  In April 2005, while still in anticipation of his upcoming surgery, Mr. Randall re-injured his left heel walking down stairs.  He was diagnosed with insertional Achilles tendinitis in his left heel, and prescribed a short leg, fiberglass cast.  He was instructed to continue using crutches to help with his weight bearing. (Tr. 233.)  In January 2006, Mr. Randall decided to defer his surgery as he had been accepted to the Fairview Southdale gastric bypass program.  (Tr. 211.)

### 4. Wrist

Mr. Randall sprained his wrist in January 2003, and underwent left wrist arthroscopy and a limited debridement of the radial carpal joint in February 2003.  (Tr. 147, 274.)  About a month

after the surgery Mr. Randall described minimal wrist pain and denied the need for any further pain medication.  (Tr. 237.)  Mr. Randall was informed he could return to his functions, letting pain be his guide.  (Tr. 273.)

In July 2003, Mr. Randall complained of pain, numbness, and tingling in his left wrist and thumb after having been given an injection earlier that month.  (Tr. 264.)  It was recommended to him, in September 2003, that he undergo an open repair of the scapholunate ligament.  (Tr. 260.)  In November 2003, Mr. Randall fell and further aggravated his left wrist, leading to a left wrist modified Blatt-Berger tenodesis of the scapholunate ligament tear, and a left flexor carpi radialis tenosynovectomy on November 5.  (Tr. 141-148.)  By March 2004, Mr. Randall reported that he felt really well, and Dr. Charry, at the Pain Management Center, noted that he was "doing much better with his wrist pain." (Tr. 189, 243.)

In December 2005, Mr. Randall again fell and aggravated his left wrist, reporting pain and numbness.  He was told he could use a brace and was recommended 600mg of Advil three times a day.  (Tr. 213.)

    **c.**    **Psychological Evaluation**

There is a history of mild and controlled adjustment disorder and depression.  On April 18, 2003, Dr. Charry diagnosed Mr. Randall with pain disorder associated with both psychological factors and general medical condition, and adjustment disorder with mixed emotional features.  (Tr. 202.)  The diagnosis noted Mr. Randall's psychological stressors as limited, and listed Mr. Randall's Global Assessment of Functioning ("GAF") score of 70.  Throughout the record, there are assessments of well controlled depression, (Tr. 207, 187, 184, among others.)  An October 2006 psychological evaluation determined Mr. Randall had a GAF of 65 and revealed no major

psychological issues that would complicate Mr. Randall's candidacy for gastric bypass surgery. (Tr. 336.)

  **d. Mr. Randall's Testimony**

  At the administrative hearing Mr. Randall first described his educational background and past work experience doing computer operation and maintenance. (Tr. 345-348.) Mr. Randall then went on to describe his pain, explaining that he had pain in his lower back, hips, and ankles that had kept him from working since 1996. (Tr. 349.) Mr. Randall described the pain as becoming worse with activity and with the weather. (Tr. 349.) Mr. Randall testified that he could walk unsteadily without crutches only for about thirty or forty feet. (Tr. 350.) Mr. Randall also testified that he could stand for only about five minutes and sit in one position for fifteen to twenty minutes. (Tr. 350.) Mr. Randall estimated that he could only lift about four to five pounds without difficulty. (Tr. 351.) Mr. Randall also described pain in his wrist when performing repetitive tasks such as typing, grasping, or needle point. (Tr. 352.)

  Mr. Randall then went on to testify that because of his edema, his feet can swell considerably on a daily basis, and that he must elevate them for hours at a time. (Tr. 355.)

  In describing his daily activities, Mr. Randall explained that he showers independently with the aide of a stool in the shower and dresses himself. (Tr. 357.) Mr. Randall explained that his mother usually cooks and does laundry because he cannot stand for extended periods of time to complete those tasks. (Tr. 357.) Mr. Randall explained that he could do his hobby, needle point, for about forty-five minutes before his hand begins cramping and would sometimes play video games for up to an hour. (Tr. 353.) Mr. Randall testified that he could drive for no more than twenty minutes at a time and that he only put 500 miles on his car in 2005. (Tr. 358.) Mr. Randall

explained that he only drives to the doctor's office and to the grocery store once a month.  (Tr. 358.)

Mr. Randall also explained that he uses an electric cart while at the grocery store and has recently

been prescribed an electric cart so that he can avoid using a wheelchair to minimize the use of his

wrist.  (Tr. 361.)

       **e.**     **Medical Expert's Testimony**

At the ALJ hearing, Dr. Steiner, testifying as the impartial medical expert, identified Mr.

Randall's medically identifiable impairments as morbid obesity, and some associated chronic

peripheral edema, bilateral knee pain attributed to osteoarthritis, numerous procedures on the knees,

culminating in the removal of the patella, some genial deformities of the knees, treatment for wrist

pain, and treatment for left heel pain relating to chronic tendinitis of the Achilles tendon, and an

injury with an avulsion fracture of the left heel.  Dr. Steiner also identified a history of adjustment

disorder, depression, and chronic pain syndrome.  (Tr. 362-363.)

Dr. Steiner then found no impairment or combination of impairments equivalent to the

listings of 20 C.F.R. § 404, Subpart P, Appendix 1.  (Tr. 364.)  Dr. Steiner next described Mr.

Randall's work related limitations as a secondary residual and time on feet, limitations on power

gripping on the left hand, and the limitation of sixty minutes at a time of repetitive activities

involving the left hand and wrist.  (Tr. 364.)  Balancing and foot pedaling would be precluded.  (Tr.

364.)  Mr. Randall's lower extremity edema problems could be managed with elevation in the

morning and at night, and perhaps midday, along with wrapping and/or use of support stockings,

and with fluid intake limitation.  (Tr. 364.)  When asked how long Mr. Randall should elevate his

legs at midday, Dr. Steiner answered, "[the] more the better, but at least a half hour." (Tr. 364-365.)

10

f.      **Vocational Expert's Testimony**

The neutral vocational expert ("VE"), Julie Harren, began by asking Mr. Randall some clarifying question concerning the nature of his 2004 work in the clerical department at Harmon Glass.  (Tr. 367-368.)  The VE then gave testimony, which was reflected in her amended Vocational Analysis, determining that Mr. Randall had past relevant work as a customer service clerk, a skilled, sedentary position with specific vocation preparation ("SVP") of 5[1].  (Tr. 140, 369.) The VE determined that the skills Mr. Randall would have obtained from his past job at Harmon Glass would be operating a computer, keeping records, and customer service.  (Tr. 369.)

The ALJ then asked the VE to consider a person of age 42 with a high school education and work experience as described by the VE's report who suffers from conditions including left wrist surgeries, obesity, bilateral knee surgeries secondary to osteoarthritis, and was treated for a left heel condition, left ankle condition, and also had reports of migraine headaches and a diagnosis of adjustment disorder and chronic pain syndrome.  (Tr. 369-370.)  The hypothetical person was restricted to lifting ten pounds occasionally, six hours of sitting, two hours of standing or walking in an eight hour workday, and would have further restrictions of no power gripping with the left hand, and could do no more than sixty minutes of repetitive activity with the left hand without need for a break.  (Tr. 370.)  There would also be no climbing, balancing, or operation of foot pedals.

---

[1]Specific Vocational Preparation is defined by the Dictionary of Occupational Titles as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  5 indicates that the job-worker situation takes over six months up to and including one year to reach the SVP. Dictionary of Occupational Titles, Appendix C: Components of the Definition Trailer (4th ed., Rev 1991).

(Tr. 370.)  The hypothetical person would require the use of a cane when ambulating and would need an opportunity to elevate the legs for at least thirty minutes at midday.  (Tr. 370.)  The VE testified that such a person would be able to perform Mr. Randall's past job of customer service clerk as Mr. Randall performed it, and as it is generally performed in the national economy.  (Tr. 371.)

When asked if there was any job in the national economy consistent with that same person if he would need to elevate the feet for as long as two hours at a time on a daily basis, the VE testified that if such an individual had to elevate his legs during the work day, he could not find a place in the competitive work force.  (Tr. 371.)  And when asked, if the same individual were unable to stand for more than five minutes at a time or sit for more than fifteen to twenty minutes at a time and then need to change positions, if such a need to frequently change positions would be consistent with competitive work, the VE testified that such an individual's needs would not be acceptable in the workplace.  (Tr. 371.)

g.      **The ALJ's Decision**

In determining whether or not Mr. Randall was disabled, the ALJ followed the five-step sequential process outlined at 20 C.F.R. § 404.1520.  At the first step in the analysis, the ALJ must determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.920(b). The ALJ determined that Mr. Randall had not engaged in substantial gainful activity since the alleged onset date.  (Tr. 18.)

The second step of the analysis is to determine whether the claimant has a medically determinable severe impairment or combination of impairments. 20 C.F.R. § 416.920(c).  An impairment is severe if it significantly limits an individual's ability to perform basic work activities.

20 C.F.R. § 416.921.  The ALJ found the following severe impairments: morbid obesity, a history of bilateral patellectomies and possible osteoarthritis, ligamentous repairs of the left wrist and arthroplasty in 2003, an ankle injury and tendon tear with an avulsion fracture and debridement procedure, and migraine headaches with a chronic pain syndrome.  (Tr.18.)

The regulations next require the ALJ to compare the claimant's severe impairments with the impairments listed in Appendix 1, Subpart P, Regulations No. 4, Listing of Impairments to determine whether the claimant's severe impairments have any equivalent on the listing. 20 C.F.R. § 416.920(d), 416.925, and 416.926.  Based on a review of the evidence and the testimony at the administrative hearing, the ALJ concluded that Mr. Randall did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  (Tr. 19.)

At the fourth step of the evaluation the ALJ must first determine the claimant's residual functional capacity.  To do so, the ALJ must consider all of the claimant's impairments, including those that are not severe, and determine his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 416.920(e) and 416.945.  The ALJ then must determine whether the claimant has the RFC to perform the requirements of his past relevant work. 20 C.F.R. § 416.920(f).  Past relevant work means work performed in the past fifteen years, or fifteen years prior to the date at which the disability must have been established.   In addition, the work must have lasted long enough for the claimant to learn to do the job and it must have been substantial gainful activity. 20 C.F.R. § 460.916(b) and 416.965.  The ALJ must then determine if the claimant is capable of performing his past relevant work.

The ALJ determined that Mr. Randall had a RFC to perform a range of sedentary work, defined as lifting up to ten pounds, standing and walking up to two hours in an eight hour day and

sitting about six hours, but with no power gripping on the left, and no more than sixty minutes of repetitive activity on the left without a break, no climbing or balancing, no operation of foot pedals. Mr. Randall's RFC would allow an opportunity to elevate the feet for thirty minutes at a time, morning, midday, and evening and allow the use of a cane for ambulation.  (Tr. 19.)

In determining Mr. Randall's RFC, the ALJ found Mr. Randall's testimony of an inability to work not credible due to the substantial inconsistencies in the record as a whole.  (Tr. 19.)  In making her determination the ALJ gave greatest weight to the restrictions opined by the ME.  The ALJ also found Mr. Randall's testimony inconsistent with objective medical evidence, the treatment of the record, and medical opinions.  (Tr. 20.)  The ALJ also found inconsistencies regarding Mr. Randall's activities of daily living and work record that did not support an allegation of inability to work.  (Tr. 20.)  The ALJ then determined that Mr. Randall was capable of performing his past relevant work as a computer service clerk.  (Tr. 24.)

Finally, the ALJ concluded that Mr. Randall had not been under a "disability," as defined in the Social Security Act, since July 19, 2004, the date his disability application was filed.  (Tr. 24.)

Since the ALJ determined that Mr. Randall was capable of performing his past relevant work, the judge did not continue on to the fifth step of the analysis in which the ALJ must determine whether the claimant is able to do any other work considering his RFC, age, education, and work experience.  20 C.F.R. § 416.920(g).

### III. STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole.  See 42

U.S.C. § 405(g); <u>see also</u> <u>Qualls v. Apfel</u>, 158 F.3d 425, 427 (8th Cir. 1998); <u>Gallus v. Callahan</u>, 117 F.3d 1061, 1063 (8th Cir. 1997); <u>Wilson v. Sullivan</u>, 886 F.2d 172, 175 (8th Cir. 1989). Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>See</u> <u>Jackson v. Apfel</u>, 162 F.3d 533, 536 (8th Cir. 1998); <u>Black v. Apfel</u>, 143 F.3d 383, 385 (8th Cir. 1998). In determining whether evidence is substantial, a court must also consider whatever is in the record that fairly detracts from its weight. <u>See</u> <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999); <u>see also</u> <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184 (8th Cir. 1989) (citing <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence would have supported an opposite decision. <u>See</u> <u>Roberts v. Apfel</u>, 222 F.3d 466, 468 (8th Cir. 2000) (internal citations omitted); <u>see also</u> <u>Gaddis v. Chater</u>, 76 F.3d 893, 895 (8th Cir. 1996). Therefore, our review of the ALJ's factual determinations is deferential, and we neither re-weigh the evidence, nor review the factual record de novo. <u>See</u> <u>Flynn v. Chater,</u> 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir. 1996).

### IV. CONCLUSIONS OF LAW

**a.     Substantial Evidence Supports the ALJ's Assessment of the Chronic Nature and Severity of Mr. Randall's Edema.**

Mr. Randall alleges that the ALJ did not properly assess the chronic nature and severity of his edema in the medical records. Judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole. <u>See</u> 42 U.S.C. § 405(g); <u>see also</u> <u>Qualls v. Apfel</u>, 158 F.3d 425, 427 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind

might find it adequate to support the conclusion." <u>Oberst v. Shalala</u>, 2 F.3d 249, 520 (8th Cir. 1993).  The Court concludes that the ALJ thoroughly assessed the medical records and came to a conclusion that is supported by substantial evidence on the record as a whole.

In making her assessment of Mr. Randall's edema, the ALJ traced Mr. Randall's history of edema through the record beginning in February 2003 and continuing through May 30, 2006.  (Tr. 20-21.)  The ALJ noted the record reflects a history of mild edema as early as February 2003, with an onset of significant edema in mid 2004.  The ALJ noted 3+ and 2+ edema in June 2004.  In reviewing the record, the ALJ observed a fluctuation in the severity of Mr. Randall's edema ranging from "mild" to "massive" and "tremendous." (Tr. 20-21.)  The ALJ also noted that medication was prescribed to Mr. Randall which improved his edema.  (Tr. 20.)  In noting the fluctuations of Mr. Randall's edema and that the edema could be controlled with medication and in light of the ME's assessment of Mr. Randall's edema, the ALJ concluded that the record is inconsistent regarding the disabling duration and intensity of Mr. Randall's edema.  (Tr. 21.)

The ALJ then further noted that, "[i]n any case, the residual functional capacity allows for leg elevations three times per day." (Tr. 21.)  In noting that Mr. Randall's RFC allows for leg elevations three times a day, the ALJ acknowledged the chronic nature of Mr. Randall's edema and his need to continue treating it.  In reviewing the fluctuating nature of Mr. Randall's edema, Mr. Randall's ability to relieve his edema with medication, and the ME's assessment of Mr. Randall's condition, the ALJ's assessment of the chronic nature and severity of Mr. Randall's edema is supported by substantial evidence.

### b.   Substantial Evidence Supports the ALJ's Determination of How Long Mr. Randall Needs to Elevate His Lower Extremities at Midday.

Mr. Randall alleges that, "[t]he ALJ was incorrect in finding that there was no medical

opinion of record that established that Mr. Randall needed to elevate his lower extremities more than thirty minutes at midday." (Pl.'s Mem. at 18.)  This, however, was not the ALJ's determination. The ALJ determined that, "[t]here is no medical opinion of record that the claimant must or should elevate his legs constantly or to a greater degree *than opined by Dr. Steiner*." (Tr. 21) (emphasis added).   Again, judicial review of the final decision of the Commissioner is restricted to a determination of whether the decision is supported by substantial evidence on the record as a whole.  See 42 U.S.C. § 405(g); see also Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).

It is true that Dr. Smith, Mr. Randall's treating physician at the Quello Clinic, stated on at least two occasions that Mr. Randall should keep his legs elevated "as much as possible" (Tr. 292, 298), and, as Mr. Randall points out, it is reasonable to assume that even though this "medical recommendation is not repeated in each medical record. . .this advice would remain constant since the nature of the edema was chronic." (Pl.'s Mem. at 18.)  Mr. Randall also correctly points out that a treating physician's opinion will be granted "controlling weight" if the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and it is not inconsistent with the other substantial evidence."  House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (internal quotations omitted).

Even giving Dr. Smith's recommendation controlling weight, however, does not detract from the ALJ's determination, informed by the ME's assessment, of how long Mr. Randall needs to elevate his feet.  The opinions of the two doctors are not inconsistent.  When asked by the ALJ how long Mr. Randall should elevate his legs at midday, the ME responded, "[t]he more the better, but at least a half an hour." (Tr. 364-365.) "The more the better" is consistent with "as much as possible."  As the government points out, Dr. Smith articulated no specific guidelines concerning

17

what amount of elevation that would be appropriate.  The ME's testimony simply elaborates where

Dr. Smith does not, providing a minimum requirement of a half hour of elevation at midday.  The

ME further recommended a "wrapping and/or support stocking" to help control the edema at the

workplace.  (Tr. 364.)

The ALJ did not determine that there was no medical opinion of record that established that

Mr. Randall needed to elevate his lower extremities more than thirty minutes at midday.  The ALJ

relied on the ME's testimony that thirty minutes at midday and elevations in the morning and

evening along with wrappings and support stockings would be sufficient to manage Mr. Randall's

edema in a workplace.  Even giving Dr. Smith's recommendations controlling weight does not

render the ME's testimony inconsistent with the record as a whole.

        **c.**        **The ALJ Properly Assessed the Credibility of Mr. Randall's Testimony and Her Determination is Supported by Substantial Evidence in the Record.**

Mr. Randall next alleges that the ALJ's credibility assessment of Mr. Randall's written

statements and testimony in regards to the severity of his edema and his need to elevate his legs for

extended periods of time is not supported by the substantial evidence in the record.  The Court finds

the ALJ properly determined that Mr. Randall's testimony is not credible and her determination is

supported by substantial evidence in the record.

The absence of objective medical evidence supporting the subjective complaints is only one

factor in the analysis in evaluating the credibility of the claimant.  Polaski v. Heckler, 739 F2d

1320, 1322 (8th Cir.1987).  In determining whether Mr. Randall's subjective testimony and written

statements are credible, the ALJ must consider all evidence relating to his subjective complaints

including both the physicians' and other third parties' observations relating to such matters as: (1)

the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating

18

and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions. Id. The ALJ must consider all of the evidence presented relating to subjective complaints of pain. Id. On appeal, this Court must consider two factors in determining whether a claimant's subjective complaints have been properly assessed by the ALJ using the Polaski criteria. First, this Court analyzes whether the ALJ considered all of the evidence relevant to Mr. Randall's subjective complaints. Benskin v. Bowen, 830, F.2d 878, 882 (8th Cir. 1987). Next, this Court considers whether the evidence contradicts Mr. Randall's own testimony and written statements so that the ALJ could discount his testimony for lack of credibility. Id.

Credibility findings lie within the purview of the ALJ, but such findings must be supported by substantial evidence. See Hardin v. Heckler, 795 F.2d 674, 676 (8th Cir. 1986); Johnson v. Heckler, 744 F.2d 1333, 1338 (8th Cir. 1984). Thus, negative credibility determinations must be supported by legitimate reasons for disbelief. See Basinger v. Heckler, 725 F.2d 1166, 1170 (8th Cir. 1984). The ALJ has a duty to make express credibility determinations and set forth the inconsistencies in the record that led the ALJ to reject the plaintiff's complaints before a plaintiff's subjective allegations of pain may be discounted. See Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988) (citing Brock v. Sec'y of Health and Human Servs., 791 F.2d 112, 114 (8th Cir. 1986)). Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1321-22.

The ALJ properly analyzed the credibility of Mr. Randall's written statements and testimony under the Polaski factors. In her analysis, the ALJ first began by listing Mr. Randall's limitations that were well-supported by the medical evidence and the medical opinion of the ME. (Tr.20.) Then, the ALJ concluded that to the extent Mr. Randall alleged a greater degree of limitation, his

allegations were inconsistent with the objective medical evidence, treatment of the record, and medical opinion. The ALJ also found inconsistencies regarding Mr. Randall's daily activities and work record that did not support an allegation of inability to work. (Tr. 20.)

The ALJ assessed each of Mr. Randall's major loci of pain, and determined that the objective medical evidence did not establish or support impairments of the severity or duration likely to cause a greater degree of limitation than determined by the ME. (Tr. 20.) The ALJ pointed out inconsistencies between Mr. Randall's statements about his pain and the record as a whole regarding Mr. Randall's complaints of edema, knee pain, ankle and heel pain, and wrist pain. (Tr. 20-23.) The ALJ also found inconsistencies in his reports of migraine headaches and in his complaints of pain disorder. (Tr 23.) In evaluating each of Mr. Randall's alleged impairments, the ALJ took note of medications Mr. Randall was taking, and how the medications were affecting his pain. (Tr. 20, 22, 23.) She also accounted for side effects from the medications. (Tr. 20, 23.) The ALJ also noted precipitating and aggravating factors including obesity, well-controlled hyper tension, injuries Mr. Randall sustained as noted throughout the record (Tr. 20, 22), and surgeries Mr. Randall underwent (Tr 21, 22).

The ALJ also cites to the record numerous times in describing Mr. Randall's functional capacity. In regards to Mr. Randall's need to elevate his feet to relieve his edema, the ALJ noted that, "there are few reports of joint swelling. . . [or] ongoing edema that would require *constant* foot elevation" (Tr. 20) (emphasis added). Upon consideration of Mr. Randall's history of edema, however, the ALJ submits, "[i]n any case, the residual functional capacity allows for leg elevations three times per day." (Tr. 21.) Further, despite Mr. Randall's complaints of pain the ALJ cited to numerous points in the record that reflect that Mr. Randall had a normal range of motion in his

20

joints, (Tr. 21, Ex. 5F, pp 25-30; Ex. 5F, pp 4-6; Ex. 5F, pp 1-3; Tr. 22, Ex. 9F, pp1-2; Ex. 5F, pp 7-9; Ex. 2F; Ex. 7F, pp 64; Ex. 7F, pp50) and despite Mr. Randall's complaints of feeling drowsy and "foggy of the mind," as a result of his medication (Tr. 210), the ALJ noted that the record reflects that at his medical appointments, Mr. Randall was alert, oriented, interactive and in no acute distress (Tr. 21, Ex. 5F, pp 18-19;  Tr. 23, Ex. 9 F pp2, among others).

The ALJ also found Mr. Randall's description of his daily activities as inconsistent with his testimony and written statements regarding his disability.  (Tr. 23.)  The ALJ noted that despite Mr. Randall's severe impairments, he is able to independently groom and bathe, cook twice per week, drive up to twenty miles at a time, watch television, and do needle point.  (Tr. 23.)  See 20 C.F.R. § 404.1529(c)(3); Gray v. Apfel, 192 F.3d 799, 804 (8th Cir. 1999); Lawrence v. Chater, 107 F.3d 674, 676 (8th Cir. 1997) (plaintiff dressed and bathed herself, did some housework, cooking, and shopping).  The ALJ also made note that Mr. Randall had not worked since 1996 but explained, "this fact cannot be well-related to any medical conditions." (Tr. 23.)  The ALJ, in making her assessments sufficiently considered the factors outlined in Polaski, and substantial evidence in the record supports her determination.

**d.**     **The ALJ Did Not Err in Finding that Mr. Randall had Past Relevant Work.**

Mr. Randall next alleges that the ALJ erred in finding that Mr. Randall had past relevant work as a customer service clerk.  Mr. Randall points out that the Dictionary of Occupational Titles ("DOT") indicates that at least six months are required to learn the job of customer service clerk, while Mr. Randall's testimony reflects that he only held his position as a customer service clerk at Harmon Glass for two months.  Mr. Randall contends that the ALJ erred in accepting the VE's finding of past relevant work citing Young v. Apfel, which states, "[a]lthough the DOT generally

controls, the DOT classifications may be rebutted with VE testimony which shows that particular jobs, whether classified as light or sedentary, may be ones that a claimant can perform." 221 F.3d 1065, 1070 (8th Cir. 2000) (internal quotations omitted).

Mr. Randall contends that because the VE did not explain why she believed that Mr. Randall could learn a job in two months that the DOT indicated required at least six months of training, she failed to adequately rebut the DOT's classification. Mr. Randall, therefore, contends the ALJ's determination of past relevant work is an error of law that should be reversed and remanded.

The Court, however, finds Moad v. Massanari, relied upon by the government, to be more on point. 260 F.3d 887, 891 (8th Cir. 2001). Young, and the cases cited therein (See e.g. Montgomery v. Chater, 69 F.3d 273, 276 (8th Cir. 1995)), address general VE determinations of what jobs are available in the national economy to a plaintiff given his RFC and the classification of work the RFC permits him to do. 221 F.3d at 1070. Moad, however, directly addresses the issue of a conflict between an un-rebutted DOT indication of the time it takes to learn a particular job, and a VE determination that a job has been learned in a shorter time period. 260 F.3d at 891. The Court in Moad explained, "[h]ere, there is no evidence suggesting that Moad failed to learn her job. . .or did not competently perform any of her duties in that position. Thus, substantial evidence supports the ALJ's finding that this was past relevant work." Id. at 891. This Court finds Moad to be on point. The ALJ's reliance on the VE's determination that Mr. Randall had past relevant work as a customer service clerk was not made in error.

22

e.      **The ALJ Did Not Err by Choosing a Hypothetical that Did Not Relate With Precision to All of Mr. Randall's Relevant Impairments and their Effects.**

Finally, Mr. Randall alleges the ALJ erred in choosing a hypothetical that did not relate with precession to all of his relevant impairments and their effects.   The Eight Circuit clearly set forth that "the hypothetical questions posed to vocational experts must precisely set out all of the claimant's impairments."   Oleary v. Schweiker, 710 F.2d 1334, 1343 (8th Cir. 1983).   The Court finds that the ALJ did not err in choosing the first hypothetical as it related with precision to all of Mr. Randall's relevant impairments and their effects.

Mr. Randall believes the ALJ's second hypothetical posed to the VE, which included the symptoms of swelling and pain with the need to elevate the feet for as long as two hours at a time on a daily basis, was the most precise reflection of Mr. Randall's RFC.   In making this assertion Mr. Randall relies on his earlier allegation that the ALJ improperly assessed the chronic nature and severity of Mr. Randall's edema and his need to elevate his legs to treat it.   As the Court has established above, the ALJ's determinations are supported by substantial evidence.   As pointed out in the Government's memorandum, the hypothetical chosen by the ALJ need only include the impairments and limitations found to be credible and supported by the record.   The ALJ can properly exclude unsupported complaints of pain and impairments from a hypothetical question. See Guilliams v. Barnhart 393 F.3d. 798, 804 (8th Cir. 2005).   Therefore, the ALJ's selection of the first hypothetical was proper.

## V. RECOMMENDATION

Based on the files, records and proceedings herein,

**IT IS hereby RECOMMENDED** that:

a.     Plaintiff's Motion for Summary Judgment [#9] be **DENIED**; and

b.     Defendant's Motion for Summary Judgment [#11] be **GRANTED.**


Dated: July 24 2008                          s/ *Franklin L. Noel*
                                             FRANKLIN L. NOEL
                                             United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **August 12, 2008**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.